IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| DONALD F. BASS, | : | |
| Plaintiff, | : | |
| v. | : | Civ. No. 13-249-LPS |
| LT. DRACE, et al., | : | |
| Defendants. | : | |

Donald F. Bass, James T. Vaughn Correctional Center, Smyrna, Delaware, Pro Se Plaintiff.

Kenisha LaShelle Ringgold, Deputy Attorney General, and Ophelia Michelle Waters, Deputy Attorney General, Delaware Department of Justice, Wilmington, Delaware. Counsel for Defendants Lt. Drace, Sgt. Gill, Sgt. Madigan, Sgt. Woloszyn, C/O Green, C/O Bradl, Officer Hicks, and C/O Cassidy.

**MEMORANDUM OPINION**

September 18, 2018
Wilmington, Delaware

STARK, U.S. District Judge:

## I. INTRODUCTION

Plaintiff Donald F. Bass ("Plaintiff"), an inmate at the James T. Vaughn Correctional Center ("VCC") in Smyrna, Delaware, proceeds *pro se* and has been granted *in forma pauperis* status. He filed this civil rights complaint pursuant to 42 U.S.C. § 1983 claiming violations of his constitutional rights. (D.I. 3) Presently before the Court is a motion for summary judgment filed by Defendants Lt. Drace ("Drace"), Sgt. Gill ("Gill"), Sgt. Madigan ("Madigan"), Sgt. Woloszyn ("Woloszyn"), C/O Green ("Green"), C/O Bradl ("Bradl"), Officer Hicks ("Hicks"), and C/O Cassidy ("Cassidy"), as well as Plaintiff's opposition. (D.I. 71, 72, 74, 75, 76)

## II. BACKGROUND

With a few exceptions, Plaintiff has been housed in the Security Housing Unit ("SHU") since 2000. (D.I 72-1 at 11) He was housed in SHU on December 13, 2012, the date of the occurrence that forms the basis of this action. (D.I. 72-2 at 1) At the time, Plaintiff was allowed recreation every other day. (D.I. 72-1 at 13)

On December 13, 2012, Gill and Green began conducting recreation on A-Tier in Building 17. (D.I. 75 at 2) Plaintiff watched other inmates go to the "inside yard" for recreation. (*Id.*). When it was Plaintiff's turn for recreation, he asked Green for inside recreation. (*Id.*) Green told Gill, his supervisor, that Plaintiff had elected to stay inside for recreation, and Gill responded that Plaintiff could not because he was "running [his] phone calls." (*Id.*) When Plaintiff replied that it was too cold, he was told he could either go outside or go to the showers. (*Id.*) Plaintiff opted to go outside and retrieved a hoodie he had borrowed from his neighbor. (D.I. 72-1 at 15, 17)

Plaintiff states that Gill forced him out in the cold. (D.I. 75 at 2) Plaintiff told Gill that phone calls are supposed to be made after rec, not during rec, and Gill prevented people from having the rec. (D.I. 72-1 at 17) Gill cuffed Plaintiff and Gill and Green escorted Plaintiff outside.

1

(*Id.*) Plaintiff said to Gill, "'Nobody's in this [inside] rec yard. The rule is if nobody's in the yard, I'm entitled to rec in this yard. You mean to tell me you're going to force me outside.' He said 'Yep, let's go.'" (*Id.*) Plaintiff responded, "Everytime you work, you're alway's [sic] on some bullshit. I'm sick of your bullshit, I want to see a lieutenant. Get me a lieutenant". (D.I. 75 at 3)

Plaintiff was escorted outside and secured in the cage. (D.I. 75 at 3) Plaintiff admits he was frustrated, upset, and angry because he was outside in the cold. (D.I. 72-1 at 18; D.I. 75 at 3) Plaintiff, who was cuffed from behind, turned around and placed his hands in the handcuff flap so the handcuffs could be removed. (D.I. 72-1 at 18) The cuffs are removed one at a time. (*Id.* at 19) The left cuff was removed. (*Id.*) Plaintiff became frustrated when Gill was removing the right cuff, said "Get the fuck off me," and pulled away while the handcuff was still secured to his right wrist. (D.I. 72-1 at 19; D.I. 75 at 3) The key was still in the handcuff key chamber; it "went propelling into the recreation yard" when Plaintiff pulled away. (*Id.*) According to Plaintiff, Gill responded, "Oh we got us a tough guy." (*Id.*) Plaintiff replied, "Nah, I'm not no tough guy I'm just sick of your shit. Now go get the fucking lieutenant." (D.I. 75 at 3) Plaintiff then kicked the perimeter gate. (*Id.*) According to Green's incident report, Plaintiff stated, "You better be lucky this gate is closed mother fucker," as he kicked the gate at the same time. (D.I. 72-3 at 16) Plaintiff admits he kicked the gate hard. (D.I. 72-1 at 27) According to Gill's incident report, Plaintiff kicked the fence with so much force that the entire fences in yards four and five were shaking. (*Id.* at D.I. 72-3 at 22) Gill's incident report also indicates that Plaintiff said, "bring the fucking lieutenant or you can come in here I wish I can get at you, you lucky I am in here . . . . I have eight life sentences I may not get you today Gill but I will eventually fuck you up." (*Id.*) Plaintiff denies making this statement. (D.I. 72-1 at 27)

Plaintiff states that he was never ordered to return to the handcuff flap, to pick up the handcuff key, or given any kind of directive. (D.I. 75 at 3-4) Plaintiff states that Fitzgerald and

2

Madigan came onto the hallway and that Plaintiff was in plain view of Fitzgerald, Madigan, Gill, and Green. (D.I. 75 at 4) Plaintiff states that he attempted to "temper the situation" when he "picked up the handcuff key off the ground, held the key up for all four officers to see, then walked over and placed the key in plain view along the windowsill." (*Id.*)

Gill and Green left the tier, notified Drace of the situation, and briefed Drace when he arrived. (D.I. 72-3 at 19, 22) The Quick Response Team ("QRT"), which included Cassidy and Bradl, arrived and Drace briefed the team. (D.I. 72-3 at 1, 19, 22) The QRT team was told that Plaintiff "had a set of handcuffs still cuffed to his arm . . . that this was a weapon and force would be necessary." (*Id.* at 7)

C/O Fitzgerald ("Fitzgerald") is not listed as a member of the QRT in the incident reports submitted. Plaintiff testified at his deposition that Fitzgerald was a QRT member but acknowledged that he did not recognize the QRT members, did not know them, and stated it is hard to determine who they are with their "ninja" suits. (D.I. 72-1 at 25)

Plaintiff states that Drace appeared outside the window while Gill walked over to the opposite side of the window and pointed to the handcuff key. (D.I. 75 at 3) Plaintiff walked over, picked up the key, held the key to window and stated, "Here, come get it. I just wanted to talk to a lieutenant." (D.I. 72-1 at 20; D.I. 75 at 3) Plaintiff walked to the handcuff flap and then tossed the key out of the cage so an officer could retrieve it. (D.I. 72-1 at 20; D.I. 72-3 at 19; D.I. 75 at 3)

Next, Plaintiff saw Drace, Woloszyn, Madigan, and the QRT members arrive, and he began pacing the yard waiting for the team to enter. (D.I. 72-1 at 21; D.I. 75 at 5) Drace and the QRT entered. (*Id.*) Gill and Green were in the pod watching. (D.I. 72-1 at 21) According to Drace, when he entered the yard, Plaintiff was standing in the middle of the yard in a "bladed fighting stance." (D.I. 72-3 at 19) Plaintiff states that Drace did not give him a directive at any time; he just

3

stared at him. (D.I. 75 at 5) Drace gave the order for the QRT to enter the yard without warning Plaintiff. (D.I. 72-3 at 19; D.I. 75 at 5)

Plaintiff states that the QRT moved extremely slowly, and he watched the team members walk slowly towards him with their arms outstretched, trying to grab him. (D.I. 72-1 at 22; D.I. 75 at 5) Plaintiff pushed the first team member off and, at that point, he was swarmed by the other team members and taken to the ground. (D.I. 72-1 at 22; D.I. 72-3 at 19; D.I. 75 at 5) Plaintiff states that his legs were shackled immediately. (D.I. 72-1 at 22) Bradl shackled Plaintiff. (D.I. 72-3 at 10) During his December 17, 2014 deposition, Plaintiff testified that he did not give the QRT members his arms because he "was concerned" but, once he was asked to give an arm and nobody had thrown a blow, he gave them his arm. (D.I. 72-1 at 23) Plaintiff's April 6, 2018 declaration states that he cooperated and gave his arm to be cuffed when asked by a team members. (D.I. 75 at 5)

Plaintiff states that Drace placed his hand over Plaintiff's nose, preventing him from breathing, causing him to fear for his life. (*Id.*) Plaintiff was struggling, wiggling, and trying to get loose to get out of Drace's grip. (D.I. 72-1 at 23; D.I. 75 at 6) Plaintiff states that Drace thrust Plaintiff's head violently back and forth in an attempt to prevent Plaintiff from getting air. (D.I. 75 at 6) Plaintiff states that his hooded sweatshirt was pulled over his head covering his eyes, but he does not know who did this. (D.I. 72-1 at 23; D.I. 75 at 6) Plaintiff states that Drace let go of his nose, but kept a stable a grip on his mouth and deployed the capstun directly into Plaintiff's left nostril. (*Id.*) Plaintiff states that Drace capstunned him a second time while he was lying face down, handcuffed, and shackled. (D.I. 72-1 at 23; D.I. 75 at 6)

Drace's incident report states that once Plaintiff was taken to the ground, Plaintiff grabbed the hood of his sweatshirt with one hand trying to cover his face, and resisted as the team tried to gain control of Plaintiff and restrain him. (D.I. 72-3 at 19) The incident report of C/O Daniel

4

Hume ("Hume"), a QRT member, states that when taking down Plaintiff, he grabbed Plaintiff's hoodie and pulled his neck down. (D.I. 72-3 at 4) Drace's report states that he stepped near Plaintiff's face and disbursed capstun around his hood and into his face. (D.I. 72-3 at 19) Hume's report states that Drace capstunned Plaintiff in the face to help the team gain control. (D.I. 72-3 at 4) After he was capstunned, Plaintiff became more compliant, and the team was able to secure Plaintiff. (*Id.*) At his deposition, Plaintiff agreed that he had been disrespectful and disorderly. (D.I. 72-1 at 27)

After Plaintiff was subdued, the QRT lifted Plaintiff to his feet and escorted him to medical for an examination. (D.I. 72-1 at 24) He was seen by nurse who tried to clean his face, but was stopped by Woloszyn who told the nurse that Plaintiff had a sink in his cell. (*Id.*) Plaintiff was cleared by medical and the QRT escorted him to his cell. (D.I. 72-3 at 4, 7, 13, 19, 22)

Plaintiff received a disciplinary report for demonstrations (strike), disorderly or threatening behavior, disrespect, and failing to obey an order. (D.I. 72-2 at 1) He was found guilty of all charges and sent to isolation for thirty days. (D.I. 72-1 at 28)

Medical records indicate that Plaintiff was administered prescribed medication daily during December 2012. (D.I. 59-4 at 140) He submitted sick calls slips on December 19, 21, and 27, 2012, and was seen by medical personnel on December 20, 22, and 30, 2012.[1] (*Id.* at 137-139) He submitted grievances on December 19, 20, and 28, 2012. (D.I. 3 at Ex. B) The December 20, 2012 grievance states that a nurse came on the tier on December 14, 2012, and Plaintiff told the nurse he needed to see her for injuries he had sustained on December 13, 2012. (*Id.* at Grievance 257193)

---

[1] Medical records indicate that subsequent to December 13, 2012, Plaintiff has been seen and treated by medical personnel on numerous occasions regarding his complaints of head and neck pain. (*See* D.I. 75 at 17-31) A CT scan of the cervical spine revealed degenerative changes at C3-4, C5-C6, and C7. (*Id.* at 24) An MRI of the cervical spine revealed degenerative disease with reversal of lordosis centered around C5 with mild disc protrusion at C6-7 without central or nerve root canal stenosis. (*Id.* at 23)

5

The nurse told Plaintiff to submit a sick call slip. (*Id.*) In the grievance, Plaintiff complained that he asked every C/O who came to his door for a sick call slip and grievance from December 14, 2012 until December 19, 2012, when Sgt. Headinger gave him a sick call slip. (*Id.*)

During his deposition Plaintiff stated that he sued Madigan and Woloszyn because they were present, watched Drace's actions, and did nothing not stop Drace. (D.I. 72-1 at 29) Plaintiff sued Bradl because he sat on his back, held him so Drace could assault him, and then watched Drace assault him. (*Id.*) Similarly, Plaintiff sued Cassidy because he sat on Plaintiff and pinned him down, Cassidy never got any help, and stood by and watched Drace assault Plaintiff. (*Id.* at 30) Plaintiff sued Drace because Drace maliciously attacked him. (*Id.* at 30) Plaintiff sued Hicks because Hicks would not give him a sick call slip or grievance while he was in the hole. (*Id.* at 29-30) Plaintiff wanted to see a nurse because he was in pain and wanted to submit a grievance so someone could look into the incident. (*Id.* at 30) He does not know how many times he asked Hicks for help. (*Id.*)

## III. LEGAL STANDARDS

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). An assertion that a fact cannot be -- or, alternatively, is -- genuinely disputed must be supported either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its

6

burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587 (internal quotation marks omitted). The Court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

To defeat a motion for summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586; *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment;" a factual dispute is genuine only where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (stating entry of summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial"). Thus, the "mere existence of a scintilla of evidence" in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment; there must be "evidence on which the jury could reasonably find" for the nonmoving party. *Anderson*, 477 U.S. at 252.

"It has long been established that, under the right circumstances, district courts are entitled to enter summary judgment *sua sponte*." *Couden v. Duffy*, 446 F.3d 483, 500 (3d Cir. 2006) (internal quotation marks omitted). This may not occur, however, "without 'placing the adversarial party on

7

notice that the court is considering a *sua sponte* summary judgment motion' and providing that party 'an opportunity to present relevant evidence in opposition to that motion.'" *Coudon*, 446 F.3d at 500 (other citations omitted). Notice is satisfied, however, if "the targeted party had reason to believe the court might reach the issue and received a fair opportunity to put its best foot forward." *Id.* (internal citations and quotation marks omitted).

Defendants move for summary judgment: (1) on the excessive force claim on the grounds that (a) the QRT, Drace, Cassidy, and Bradl used the force necessary to secure Plaintiff, given the apparent physical threat Plaintiff posed to the officers, and (b) Fitzgerald, Madigan, Hicks, Green, and Woloszyn did not use force against Plaintiff; (2) on the failure to protect claim, on the grounds that (a) Plaintiff never faced conditions that posed a substantial risk of serious harm, and (b) Defendants use the minimum force necessary to subdue Plaintiff; and (3) the medical needs claim, as the evidence of record does not support it. (D.I. 72)

Defendant C/O Fitzgerald ("Fitzgerald") was served with process (*see* D.I. 37), but has not appeared. However, all parties refer to him in the instant motion and its opposition. Therefore, the Court construes Defendants' motion as seeking summary judgment on behalf of Fitzgerald. Defendants and Plaintiff thoroughly addressed the substantive issue of excessive force and failure to protect or intervene in the motion for summary judgment and in Plaintiff's opposition.

## IV. DISCUSSION

### A. Excessive Force

Plaintiff alleges that Drace and members of the QRT used excessive force during the December 13, 2012 incident. Defendants argue that summary judgment is warranted because they used the force necessary to secure Plaintiff given the apparent physical threat he posed to the officers.

The Eighth Amendment protects inmates against the application of excessive force by correctional officers. *See Whitley v. Albers*, 475 U.S. 312, 318-19 (1986). In an excessive force claim, the core judicial inquiry is not whether a certain quantum of injury was sustained, but rather whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. *See Wilkins v. Gaddy*, 559 U.S. 34 (2010). Relevant factors in this analysis include: (1) the need for application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by the responsible officials; and (4) any efforts made to temper the severity of a forceful response. *See Hudson v. McMillian*, 503 U.S. 1, 7 (1992). The absence of serious injury is a relevant, but not dispositive, additional factor to be considered in the subjective analysis. *Id.*

The key inquiry is whether a prison official "maliciously and sadistically use[d] force to cause harm," regardless of whether an inmate suffered a "significant injury." *Hudson*, 503 U.S. at 9. However, "the extent of injury suffered by an inmate . . . may suggest whether the use of force . . . evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Id.* at 7. "There exists some point at which the degree of force used is so minor that a court can safely assume that no reasonable person could conclude that a corrections officer acted maliciously and sadistically." *Reyes v. Chinnici*, 54 F. App'x 44, 48-49 (3d Cir. Nov. 18, 2002) (holding force was *de minimis* where corrections officer punched inmate in the shoulder to avoid being spit on); *accord Thomas v. Ferguson*, 361 F. Supp. 2d 435, 439-41 (D.N.J. 2004) ("Even if proven to be true and for no necessary purpose, Defendants' alleged conduct [punching and shoving of inmate] does not meet the Constitutional standard for a claim of a malicious and sadistic use of force 'repugnant to the conscience of mankind.'"); *Wilson v. Reinhart*, 2003 WL 21756393 (D. Del. Jul. 29, 2003) (same where officer sprayed inmate in face with mace).

Viewing the record in light of these factors, the Court finds that Plaintiff cannot prevail on his excessive force claims. The evidence indicates that Defendants took action after Plaintiff used threatening language, was angry, and had access to handcuffs that could be used as a weapon. Although the parties' accounts differ slightly, it is undisputed that Plaintiff was disruptive, disorderly, and recalcitrant. With respect to the decision to capstun Plaintiff, a reasonable juror could only conclude it was done in an attempt to keep order.[2] Even construing the facts in the light most favorable to Plaintiff, as the Court must, the record fails to demonstrate a use of force that is "repugnant to the conscience of mankind."

Accordingly, the Court finds that with regard to those Defendants involved in the takedown, "the need for the application of force" was on account of "the extent of the threat to the safety of staff and inmates" posed by Plaintiff's conduct, and force was applied in a good faith effort to maintain or restore discipline. *Brooks v. Kyler*, 204 F.3d 102, 106 (3d Cir. 2000) (citation omitted). A reasonable jury could not find that, based on the circumstances, the force used was excessive. With regard to the remaining Defendants, including Fitzgerald, there is no evidence that any of them applied force to Plaintiff. Accordingly, the Court will grant Defendants' motion for summary judgment on the excessive force claim.

**B.     Failure to Protect**

Plaintiff contends that Defendants failed to protect him from harm and, in particular, from the actions of Drace. A prison staff member has "a duty to take reasonable steps to protect a victim from another officer's use of excessive force." *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002) (internal quotation marks omitted). However, without an underlying finding of the excessive use of

---

[2] With regard to the use of capstun, the injuries complained of by Plaintiff are the normal after-effects associated with the use of capstun. Plaintiff continues to complain of head and neck pain that he claims resulted from the December 13, 2012 incident. Diagnostic testing revealed Plaintiff has cervical spine degenerative changes.

force, there can be no claim for failure to protect. *See Nifas v. Coleman*, 528 F. App'x 132 (3d Cir. June 13, 2013); *Wardell v. City of Erie*, 2015 WL 6134014 (W.D. Pa. Oct. 16, 2015) ("If there is no excessive force, then there is no corresponding duty to intervene.").

As previously discussed, a reasonable jury could not find the use of force was excessive. As a result, Defendants had no duty to intervene. Therefore, the Court will grant the motion for summary judgment on the failure to protect claim.

### C. Medical

Plaintiff claims that Hicks was deliberately indifferent to his medical needs because, on one occasion, he allegedly would not provide Plaintiff with a sick call slip. Defendants argue that summary judgment is appropriate because there is no evidence that Hicks intentionally refused to provide medical treatment.

To prove a violation of Plaintiff's constitutional right to adequate medical care, Plaintiff must establish: (1) a serious medical need, and (2) acts or omissions by prison officials indicating deliberate indifference to his need. *See Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). "[A] medical need is 'serious' for the purposes of a denial of medical care claim if it is either 'one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention.'" *Mattern v. City of Sea Isle*, 657 F. App'x 134, 138 (3d Cir. Aug. 24, 2016). As to the second prong, deliberate indifference is shown "where (1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, and (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 538 (3d Cir. 2017). "In situations involving claims for inadequate medical care, we have found deliberate indifference in situations where there was 'objective evidence that [a] plaintiff had serious need for

medical care,' and prison officials ignored that evidence." *Mattern*, 657 F. App'x at 140 (quoting *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003)).

Nothing the record indicates that Hicks knew or was aware that Plaintiff needed medical care. Nor is there evidence of record that during the time in question, Plaintiff had been diagnosed by a physician as requiring treatment or that Plaintiff's need for medical treatment was obvious to a lay person, such as Hicks. Rather, the record indicates that Hicks did not provide Plaintiff with a sick call slip. Of note is that other correctional officers also did not provide Plaintiff with sick call slips, as complained by Plaintiff in his grievance. Notably, Plaintiff does not mention Hicks in his grievance. Also of note is that Plaintiff was screened by a nurse after the incident and allowed to return to his cell. In addition, the next day, Plaintiff had an interaction with a nurse who, it appears, did not recognize the necessity for immediate attention. Instead, she advised Plaintiff submit a sick call slip. Moreover, the record indicates that Plaintiff was administered medication on a daily basis. It seems that if there was a need for immediate medical attention, medical personnel would be alerted to that fact. Here, there is no evidence of record that Hicks, a correctional officer, knew of, and disregarded, an excessive risk to Plaintiff. *See Mattern*, 657 F. App'x at 140. Therefore, the Court will grant the motion for summary judgment as to the medical needs claim.

V.  **CONCLUSION**

For the above reasons, the Court will: (1) grant the motion for summary judgment filed by Defendants Lt. Drace, Sgt. Gill, Sgt. Madigan, Sgt. Woloszyn, C/O Green, C/O Bradl, Officer Hicks, and C/O Cassidy (D.I. 71); and (2) grant summary judgment *sua sponte* to Defendant C/O Fitzgerald.

An appropriate Order will be entered.

12